UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:22-CV-23961-DPG

DAMIAN R. JOSEFSBERG, individually
and on behalf of all others similarly situated,

       Plaintiff,

v.

UBER TECHNOLOGIES, INC., and
CHECKR, INC.,

       Defendants.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT UBER TECHNOLOGIES, INC.'S MOTION TO DISMISS

Plaintiff, Damian R. Josefsberg, individually and on behalf of all others similarly situated (the "Plaintiff" or "Mr. Josefsberg"), hereby files his Response in Opposition to Defendant Uber Technologies, Inc.'s ("Uber") Motion to Dismiss Plaintiff's Class Action Complaint [ECF No. 27] (the "Motion"), and states:

## INTRODUCTION

"Get in the Driver's Seat and Get Paid" are the words that first greet visitors to the homepage of Uber's website.  Visitors are then encouraged to "drive on the platform with the largest network of active riders" and provided a link to "Sign up to drive".  From the moment that homepage loads on your screen, you get a clear picture of Uber's number one priority:  sign up as many drivers as possible.  Because most of Uber's revenues come from the rides its drivers provide, the more drivers it has, the more money it makes.  So, any measure that reduces the rate at which drivers sign up, get approved, and start giving rides will presumably reduce revenues.  While touting driver background checks is reassuring to riders (which Uber also seeks to attract), if they are too thorough and uncover

disqualifying information (such as criminal histories or false identities), Uber won't be able to sign up as many drivers.

Nevertheless, Uber's webpage on rider safety proclaims: "All drivers are background checked before their first trip" by "third-party background check providers Checkr, HireRight, and Samba Safety, each of which is accredited by the Professional Background Screening Association." Uber then declares that each prospective driver is required to "undergo a multi-step safety screen" and submit certain verifiable information to become active on the platform, including their driver license (which "must be active and free of disqualifying restrictions"), "proof of insurance", "vehicle inspection form", and "vehicle registration". And, after "all of your documents have been processed and you have passed the background check, you can begin driving using the Uber app."

Uber even warns that **Assuming someone else's identity is prohibited** … Drivers are periodically asked to take a photograph of themselves, which we match against their on-file identification to help make sure the right driver is behind the wheel." Unfortunately, as demonstrated in the Complaint, Uber's background checks and multi-step safety screens are not very thorough or consistent. As a result, Mr. Josefsberg suffered damages that could have been prevented had Uber followed the background check and identity verification procedures it promised. Acknowledging such failures, Uber created a webpage for the victims of its drivers' identity theft: "I do not drive with Uber, but I received a 1099 tax document from Uber".

Diverting attention from the foregoing, Uber's Motion to Dismiss challenges the sufficiency of Mr. Josefsberg's claims for negligence, violations of the Fair Credit Reporting Act, and violations of Florida's Deceptive and Unfair Trade Practices Act with arguments that are contrary to applicable law, ignore relevant allegations, and shift the blame to its "accredited" background checker and a victim who couldn't know his identity had been stolen. As such, the Motion should be denied in its entirety.

## ARGUMENT

### I.    LEGAL STANDARD

The threshold for surviving a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a low one.  *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al.*, 711 F.2d 989, 995 (11th Cir. 1983).  A plaintiff must plead only enough facts to state a claim for relief that is plausible on its face.  *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1968-69 (2007) (abrogating the "no set of facts" standard for evaluating a motion to dismiss established in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  In evaluating the sufficiency of a complaint on a motion to dismiss, the well pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff.  *Quality Foods*, 711 F. 2d at 994-95.

### II.    THE COMPLAINT PROPERLY PLEADS A NEGLIGENCE CLAIM.

Uber alleges that Mr. Josefsberg has not properly pled a claim for negligence.  To state a negligence claim, a plaintiff must plead facts sufficient to establish: (1) a legal duty of defendant; (2) breach of that duty; (3) damages; and (4) a causal connection between defendant's breach and plaintiff's damages.  *See Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003)).  Plaintiff must also show a causal connection between the damage and Uber's alleged conduct sufficient to confer standing under Article III.  *See id.*  The foregoing elements were sufficiently pled and detailed in the Complaint, as demonstrated *infra*.

#### A.  Uber Owed a Duty to Mr. Josefsberg.

Uber argues that Mr. Josefsberg cannot establish that Uber had any duty to ascertain the identity of a bad actor.  *See* Motion at 19.  Uber contends that it "owed no duty to Mr. Josefsberg to independently and separately investigate and ascertain the true identity of the bad actor outside of Uber's already **robust** background check process carried out by Checkr."  *Id*. at 21 (emphasis added).  Under Florida law, however, Uber owed a duty of care to not subject Mr. Josefsberg and the putative

class to an unreasonable risk of harm because they were foreseeable and probable victims of Uber's inadequate security practices.

### i. *Harm From Driver Identity Theft is Foreseeable on Uber's Platform.*

A duty may arise where the defendant created "a foreseeable zone of risk arising from the acts of defendant." *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (citing *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 n.2 (Fla. 1992)). Uber's ride-sharing service utilizes third-party drivers who, before becoming drivers, must submit online applications with personal identifying information that Uber considers in deciding whether to permit the applicant to become a driver. Because an applicant with a criminal background can submit the personal identifying information (*e.g.*, social security number) of another individual whose identity he stole, and the entire application process is completed online without in-person interviews, if Uber (or the background check company it hires) fails to perform a proper background check and/or verify the applicant's identity, the identity thief could become an Uber driver, earn income under the victim's social security number and otherwise harm the victim, and cause harm to ride-sharing passengers and other members of the public. The fact that Uber (or the background check company it hires) performs background checks on its driver applicants and, on its website, reassures the public of this and other measures it takes to protect its passengers and the public demonstrates that Uber is well aware of the risk of harm that criminals, including identify thieves, pose to their passengers. In fact, Uber's website provides information for individuals whose identities were stolen by Uber drivers. Therefore, the risk of harm that can result from identity theft is well-known and foreseeable on Uber's platform.

Given the foreseeable risk of harm stemming from identity theft on Uber's platform, Uber had a duty to take reasonable measures to prevent such activities from occurring. Complaint at ¶¶ 80-81, 85. This includes implementing strict identity verification procedures to prevent individuals from using false identities on its platform. *Id.*

"To impose a duty, it is not enough that a risk merely exists or that a particular risk is foreseeable; rather, the defendant's conduct must *create* or *control* the risk before liability may be imposed." *Demelus v. King Motor Co. of Fort Lauderdale*, 24 So. 3d 759, 761 (Fla. 4th DCA 2009) (citing *Aguila v. Hilton, Inc.*, 878 So. 2d 392, 395, 396-97 (Fla. 1st DCA 2004)). Here, Uber both *created* the risk that a driver using the identity of another individual would use its platform and had the ability to *control* that risk. Uber created the risk by offering a transportation service that utilizes third-party drivers who submit personal identifying information for verification and had the ability to control the risk by taking robust measures to verify the identities and backgrounds of those drivers. *See* Complaint at ¶ 80; Motion at 21.

Uber takes the position that it is not obligated to prevent harm caused by third parties. *See* Motion at 14-15. However, Florida law recognizes circumstances in which a defendant has a duty to prevent intentional or criminal conduct by another. *See Vic Potamkin Chevrolet, Inc. v. Horne*, 505 So. 2d 560, 562 (Fla. 3d DCA 1987) (*en banc*) (approved, 533 So. 2d 261 (Fla. 1988)). Those circumstances include where the defendant is in actual or constructive control of the tortfeasor or instrumentality. *See id.* Here, Uber had control of the identity thief and the instrumentality that caused the harm and injury to Mr. Josefsberg: (1) Uber hired and directed Checkr to perform and provide a background check on the applicant using the identity of Mr. Josefsberg; (2) Uber was in control of allowing an individual who used Mr. Josefsberg's identity to drive on Uber's platform; (3) Uber failed to cancel that driver's account until months after being notified of the identity theft and fraud committed by the driver; (4) Uber issued an improper tax filing under Mr. Josefsberg's social security number for income he did not earn; and (5) Uber failed to fix the improper tax filing. *See* Complaint at ¶¶ 42-46.

Uber alleges that even if there was a negligent act traceable to it, there is no proximate cause as the injury is a result of an unforeseeable intervening criminal act. *See* Motion at 16. However,

Florida courts have held that where the intervening criminal act was foreseeable to the original tortfeasor's negligent act, that negligent act is a proximate cause of the injury. *See Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 23 (Fla. 4th DCA 2022). Here, Mr. Josefsberg has sufficiently alleged a nexus between Uber's failure to complete a proper background check and Mr. Josefsberg's harm resulting from Uber's (i) permitting a driver who used Mr. Josefsberg's identity to drive on its platform, and (ii) filing of an erroneous 1099-NEC stating that Mr. Josefsberg earned income from Uber. *See* Complaint at ¶ 63. Likewise, Uber knew, or reasonably should have known, of the foreseeable consequences of its failure to properly screen its drivers, as many instances of substantially similar conduct have been reported to Uber in the past (such that Uber created a webpage to address the issue). *See id.* at ¶¶ 48, 93-94. And, thousands of nationwide rideshare and delivery scams and violent crimes involving Uber's platform have placed Uber on notice that it has systemically failed to verify the identity of its drivers and thereby prevent criminals from utilizing its platform and harming customers and the public at large. *See id.* at ¶ 48.

Moreover, Mr. Josefsberg is alleging that Uber caused a foreseeable harm by failing to take remedial measures upon learning that one of its drivers had used Mr. Josefsberg's identity to become a driver and Uber had paid that driver and issued a 1099 under Mr. Josefsberg's social security number causing harm to Mr. Josefsberg. *See id.* at ¶ 63. Specifically, Uber failed to immediately suspend the driver's Uber account or correct the improperly filed 1099-NEC. *See id.*

### ii. *A Legal Duty Arises from Uber's Undertaking the Task of Identity Verification.*

Uber argues that its driver screening procedures or corporate policies do not create a legal duty. Uber cites several cases to support the notion that corporate policy does not create a separate duty of care. However, all of those cases find that "a company's internal safety policies may be evidence of a standard of care" and that a duty is owed where defendant created a foreseeable zone of risk. *See, e.g.,*

6

; *Boutilier ex rel Boutilier v. Chrysler Ins. Co.,* 2001 U.S. Dist. LEXIS 5526, 2001 WL 220159, at *1

(M.D. Fla. Jan. 31, 2001*)*; (citing *Mayo v. Publix Super Markets, Inc*., 686 So. 2d 801, 802 (Fla. 4th

DCA 1997) (a company's safety policies may be evidence of a general standard of care); *Alcon Labs.,*

*Inc. v. Allied Vision Grp., Inc.,* No. 18-CV-61638, 2019 U.S. Dist. LEXIS 37718, at *20 (S.D. Fla.

Mar. 7, 2019) (finding corporate policy did not create an independent duty of care **where defendant**

**did not create the risk**) (emphasis added).

Having created minimum standards for hiring drivers and undertaken to perform consumer

driving and criminal record checks of its drivers before sending them out on the road to pick up

passengers under Uber's guise of safe professional drivers, Uber cannot now credibly claim that it

owes no duty to actually screen its drivers or adhere to its own minimum standards.  *See, e.g., Riedel*

*v. Sheraton Bal Harbour Assoc*., 806 So. 2d 530, 532 (Fla. 3d DCA 2001) ("Although the Sheraton

initially had no obligation to provide the Riedels with medical assistance, once it undertook this task,

it had a duty to exercise reasonable care.").  This standard, known as the undertaker's doctrine, which

is well established under Florida law, imposes a duty of care on Uber under these circumstances.

In *Clay Electric Cooperative*, the Court adopted the standard set forth in section 324A of the

Restatement (Second) of Torts (1965):

> One who undertakes, gratuitously or for consideration, to render services to another
> which he should recognize as necessary for the protection of a third person or his
> things, is subject to liability to the third person for physical harm resulting from his
> failure to exercise reasonable care to protect his undertaking, if:
>
> (a)  his failure to exercise reasonable care increases the risk of harm, or
>
> (b)  he has undertaken to perform a duty owed by the other to the third person, or
>
> (c)  the harm suffered because of reliance of the other or the third person upon the
>      undertaking.

873 So. 2d at 1185; *see also Rehab. Ctr. at Hollywood Hills, LLC v. Fla. Power & Light Co*., 299 So.

3d 16, 17 (Fla. 4th DCA 2020).

Uber has minimum standards for the hiring of its drivers, known as "Driver Screening." Complaint at ¶ 46. Pursuant to Uber's "Driver Screening" procedures, when the individual who stole Mr. Josefsberg's identity applied to become an Uber driver, Uber was required to check his driving and criminal background before permitting him to become a driver. *See id*. at ¶ 24. However, the identity thief's background was not checked by Uber or its background check company (Checkr). Indeed, Uber did not ascertain the full address, full social security, or date of birth of the individual on which it was running a background check. *See id*. at ¶ 8. Moreover, it did not obtain or request a proof of identity.[1] This is despite Uber's "driving screening" stating that "drivers are periodically asked to take a photograph of themselves, which we match against their on-file identification to help make sure the right driver is behind the wheel." *Id*. at ¶ 46.

The Florida Supreme Court has held that "voluntarily undertaking to do an act that if not accomplished with due care might increase the risk of harm to others . . . confers a duty of reasonable care, because it thereby 'creates a foreseeable zone of risk.'" *Union Park Memorial Chapel v. Hutt*, 670 So. 2d 64, 67 (Fla. 1996) (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla.1992)). Therefore, Uber owed a duty of care to protect Mr. Josefsberg from an unreasonable risk of harm because he was a foreseeable and probable victim of any inadequate security practices that Uber failed to implement to protect its drivers, users, and the public.

---

[1] Mr. Josefsberg through Uber attempted to obtain any information that would show that Checkr or Uber obtained the required consent to run a background check or identity verification on Mr. Josefsberg before allowing an individual to drive under his name. *See* Complaint at ¶ 38. Specifically, Mr. Josefsberg requested any documents and correspondence between Uber and Checkr related to any "background check or identity verification that Checkr, Inc. performed for and provided to Uber associated with any individual using Mr. Josefsberg's name, social security number, or other personal identifiable information." *Id*. These background and verification documents were requested on multiple occasions. *See id*. at ¶¶ 38-42. Despite such requests, Uber failed to provide any documents showing that any verification was obtained by Uber before running the report in Mr. Josefsberg's name. *See id*. at ¶¶ 43, 45.

**B. Mr. Josefsberg Sufficiently Alleged Uber Breached Its Duty of Reasonable Care.**

As outlined above, Uber owed a duty to Mr. Josefsberg to verify the identity of its driver applicants before permitting them to become drivers. Complaint at ¶¶ 80, 83. Uber breached this duty by not adequately verifying the identity of its drivers and, in particular, the driver who had stolen Mr. Josefsberg's identity and permitting him to become an Uber. *See id.* at 85. Indeed, as mentioned above, Uber faces this issue so often that it has a webpage dedicated to assisting victims of Uber drivers' identity theft.[2] Unfortunately, Uber is not very helpful even when victims follow the protocol laid out on its webpage. *See id.*at ¶¶ 45, 50, 63.

Uber cannot not credibly argue that it did not breach the duty of reasonable care because it was put on notice of the Uber driver's theft of Mr. Josefsberg's identity but did not stop the driver from continuing to use its platform (and Mr. Josefsberg identity) for more months, causing additional harm to Mr. Josefsberg. *See* Complaint at ¶ 44. By doing so, Uber failed to take reasonable steps to prevent foreseeable harm to Mr. Josefsberg. This failure to act is a breach of Uber's duty to exercise reasonable care to ensure the safety and security of its users and drivers.

Moreover, Uber breached its duty of care by filing a 1099-NEC under Mr. Josefsberg's name and social security number. *See id.* at ¶¶ 29-31. Mr. Josefsberg was not even informed of that tax filing until, for business purposes, he ordered his IRS transcript and saw that it reflected the issuance of the 1099-NEC under his social security number. *See id.* at ¶ 30. The 1099-NEC filed by Uber did not even list Mr. Josefsberg's street address, instead listing it as "UNKNOWN". *See id.* at ¶ 31. Despite having sufficient proof that it had filed an improper 1099-NEC under Mr. Josefsberg's name and social security number, as of the commencement of this action, Uber had neither corrected its

---

[2] *See* Uber, "I do not drive with Uber, but I received a 1099 tax document from Uber", https://help.uber.com/driving-and-delivering/article/i-do-not-drive-with-uber-but-i-received-a-1099-tax-document-from-uber?nodeId=edd5d179-cbd5-49b7-ae55-19d865cd9efa (last visited March, 17, 2023).

erroneous tax filing nor complied with Mr. Josefsberg's requests for documents and correspondence related to any background check or identity verification it purportedly had performed for the identity thief's driver account, constituting a continued breach of its duty of care to Mr. Josefsberg. *See id*. at ¶ 37-43.

## III.   FAIR CREDIT REPORTING ACT

The FCRA requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of" consumer reports and imposes liability on "[a]ny person who willfully fails to comply with any requirement [of the Act] with respect to any consumer is liable to that consumer". 15 U.S.C. §1681e(b), §1681n(a).  Uber argues that the Count III should be dismissed for lack of Article III standing.  Specifically, Uber asserts that Mr. Josefsberg cannot establish that Uber's actions were the proximate cause of his damages as required under the FCRA.  *See* Motion at 17.

Uber cites to *Peters v. St. Joseph Servs. Corp.* for the notion that unknown third parties break the chain in causation.  *See* 74 F. Supp. 3d 847, 857 (S.D. Tex. 2015).  However, the *Peters* plaintiff was unable to allege any quantifiable damage or loss suffered at the hands of the defendant and the court was not able to find proximate cause because there was no clear and direct link between defendant's actions and plaintiff's injuries.  *See id.*  Here, Mr. Josefsberg has pled a clear and direct link between Uber's actions and his damages.

Indeed, the Complaint alleges that Defendant systematically violated section 1681b(b)(3) of the FCRA by ordering consumer reports without providing the person who is the subject of the report sufficient and timely notice of the report.  *See* Complaint at ¶ 51.  Then, it alleges that Uber failed to get actual consent from Josefsberg and other putative class members before running consumer reports. *See id*. at ¶ 110.  And finally, the Complaint alleges that, as a result of Uber's "illegal procurement of credit and background reports by way of their inadequate disclosures . . . Plaintiff and Class members

have been injured . . . in violation of the FCRA." *Id.*  As such, Mr. Josefsberg has sufficiently pled causation and has standing to pursue his FCRA claim.

**A. Uber Violated the FCRA by Failing to Obtain Identification Prior to Running the Report.**

Mr. Josefsberg has properly pled that Uber violated Section 1681b(b)(3) of the FCRA by ordering consumer reports without, beforehand, providing sufficient and timely notice to Mr. Josefsberg and others similarly situated.  *See* Complaint at ¶102-103, 107.  Uber argues that the FCRA does not require Uber to ascertain who they obtain authorization from and does not require "identification verification."  *See* Motion at 24.

Uber contends that Mr. Josefsberg fails to consider that Uber may have obtained the required consent to run the background check from the individual who used Mr. Josefsberg's identity to become a driver.  *See id.*  Curiously, however, Uber did not state *anywhere* in its Motion that it did obtain the required consent from Mr. Josefsberg or any individual purporting to be Mr. Josefsberg.  In fact, pre-suit, Mr. Josefsberg had attempted to obtain any information that would show that Uber had obtained the required consent from the identity thief or Mr. Josefsberg to run the report.  *See* Complaint at ¶ 38.  Specifically, Mr. Josefsberg requested any documents and correspondence between Uber and Checkr related to any "background check or identity verification that Checkr, Inc. performed for and provided to Uber associated with any individual using Mr. Josefsberg's name, social security number, or other personal identifiable information."  *Id.*  These verification documents were requested on multiple occasions.  *See id.* at ¶¶ 38-42.  Despite the requests, Uber has failed to provide any documents showing that any verification was obtained by Uber before running the report in Mr. Josefsberg's name.  *See id.* at ¶¶ 43, 45.

In the Complaint, Mr. Josefsberg alleged that Uber did not verify nor indicate that it obtained the necessary consent before running a background check using Mr. Josefsberg's information.  *See*

Complaint at ¶102-103, 107.  In particular, Mr. Josefsberg has pled that Uber procured or caused to be procured consumer reports without informing Mr. Josefsberg or putative class members of their rights under the FCRA.  *See id*. at ¶ 108. Therefore, because these allegations must be accepted as true and viewed in the light most favorable to Mr. Josefsberg, Mr. Josefsberg has pled causation sufficient to have standing to bring a claim for violation under FCRA for which he and others similarly situated are entitled to compensation.  *See Quality Foods,* 711 F. 2d at 995.

Uber further argues that it has no responsibility for identification verification under the FCRA, citing *Domante v. Dish Networks,* 974 F.3d 1342, 1346 (11th Cir. 2020). *See* Motion at 25.  Indeed, *Domante* stands for the notion that under the FCRA a defendant must procure information to verify the person's identity before requesting a report. *Id.* at 1347. Here, Uber did not verify the information submitted by the driver applicant, especially considering such information was being used to hire a driver for the public at large and, in fact, the applicant was approved to become an Uber driver despite using Mr. Josefsberg's identity (and providing only partial personal identifying information) in his application. *See* Complaint at ¶ 93. And, in *Domante,* where the stolen information was used to merely open a personal cable account, the defendant obtained more information than Uber by requiring a birth date. 974 F.3d at 1347.

Uber also cites two other cases that strictly address the "proper purpose" for obtaining a consumer report.  *See* Motion at 26.  These decisions are inapposite as Mr. Josefsberg is not alleging that Uber obtained the report for an improper purpose but rather obtained the report without proper authorization.[3] *See* Complaint at ¶ 93.

---

[3] *See* re Glanton v. DirecTV, LLC, 172 F. Supp. 3d 890, 896  (D.S.C. 2016) (dismissing the FCRA claim because plaintiff did not allege any facts that the consumer report was not obtained for a proper purpose under 15 U.S.C. § 1681b(f)); (Danehy v. Jaffe & Asher, LLP, 2015 U.S. Dist. LEXIS 32579, *12) (finding plaintiff has failed to plead sufficient facts from which the court could infer defendant lacked a permissible purpose to request his consumer report).

Taking the Mr. Josefsberg's allegations as true and drawing reasonable inferences in the Mr. Josefsberg's favor, Uber has failed to comply with the FCRA by not obtaining the consent needed to run background reports and not adequately verifying the identity of driver applicants.

### B.  Mr. Josefsberg Properly Alleges that Uber's Conduct was Willful *or* Negligent.

To state a cause of action under the FCRA, a plaintiff must allege that defendant's alleged FCRA violation was either negligent *or* willful.  *See Helman v. Udren L. Offs., P.C.*, 85 F. Supp. 3d 1319, 1331–32 (S.D. Fla. 2014).  Under the majority rule, a willful act is defined as "simply a knowing and intentional act, without malevolent purpose."  *See Cowley v. Burger King Corp.* 2008 U.S. Dist. LEXIS 87852 (S.D. Fla., May 23, 2008).  The United States Supreme Court interpreted the term "willful" as used in section 1681n, expressly holding that section 1681n(a) encompasses not only knowing and intentional violations of the FCRA, but reckless ones as well.  *See Safeco Ins. Co. of Am. v. Burr,* 127 S. Ct. 2201, 2216, 167 L. Ed. 2d 1045 (2007); *id*. at 2208-11.[4]

Here, while Mr. Josefsberg primarily claims that Uber's alleged FCRA violation was willful, *see* Complaint at ¶ 109 (alleging that "Defendants **willfully** violated and continue to violate the FCRA including, but not limited to, § 1681b(b)(2)(A).  Defendants' willful conduct is reflected by, among other things, the facts set forth above") (emphasis added), Mr. Josefsberg alternatively alleged that Uber negligently violated the FCRA.  *See id*. at ¶ 112 ("In the alternative to Plaintiff's allegations that these violations were willful, Plaintiff alleges that the violations were negligent").  In particular, Mr.

---

[4] "Willfulness under the FCRA is understood to be a question of act for the jury".  *Cowley,* 2008 U.S. Dist. LEXIS 87852 (S.D. Fla., May 23, 2008) (citing to *Edwards v. Toys "R" Us,* 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007) (denying a merchant's motion for summary judgment, finding that material issues of fact existed as to whether the merchant willfully violated FACTA)); *see also Lenox v. Equifax Information Services LLC*, No. 05-01501-AA, 2007 U.S. Dist. LEXIS 34453 at *19 (D. Or. May 7, 2007) ("the determination as to whether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact").

Josefsberg alleged facts sufficient to conclude that Uber was willful or reckless in its violation of the FCRA:

> Defendants [Uber and Checkr] acted in deliberate or reckless disregard of their obligations and the rights of consumers, including Mr. Josefsberg and class members. Defendants' willful conduct is reflected by, among other things, the following facts: (a) Defendants are large corporations with access to legal advice; (b) Defendants required a purported authorization to perform consumer and background checks in the employment process which, although defective, evidences Defendants' awareness of and willful failure to follow the governing laws concerning such authorizations; (c) despite knowledge of the consumer protections afforded to prevent unauthorized use of a consumer's background report, Defendants did not contact Plaintiff or the Class members to verify their identities and/or to ensure that they were running background reports for the correct people, (d) Indeed, Defendants did not make any effort to confirm that they had Plaintiff or Class members' authorization to order or prepare the background reports and to prevent identity theft that occurred here; and (e) The plain language of the statute unambiguously indicates that failure to obtain consent and provide notice to the actual consumer whose background report is being prepared violates the disclosure and authorization requirements of the FCRA.

*Id*. at ¶ 107.  If evidence is presented to support the foregoing allegations, a reasonable jury could find that Uber's violations of the FCRA were willful or reckless as opposed to merely negligent.  Or, the jury could find that Uber was negligence in its violations.  But, regardless, because Mr. Josefsberg alleged that Uber's violation was willful (or reckless) or negligent, he has sufficiently pled his claim for Uber's violation of the FCRA.  *See id*. at ¶¶ 107, 109, 112.

## IV.     FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### A.   Mr. Josefsberg Has Properly Pled Causation Under FDUTPA.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  § 501.204(1), Fla. Stat.  A FDUTPA plaintiff must sufficiently plead three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."  *Carriuolo v. GM Co*., 823 F.3d 977, 983 (11th Cir. 2016).  "A deceptive practice under the FDUTPA is a 'material representation or omission that is likely to mislead the consumers acting reasonably under the circumstances.'"  *Burrows v. Purchasing Power, LLC*, No.

1:12-cv-22800-UU, 2012 U.S. Dist. LEXIS 186556, at *18 (S.D. Fla. Oct. 18, 2012). "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

Under Florida law, "an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably." *Carriuolo*, 823 F. 3d at 984. "That is, '[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.'" *Id.*; *see Harris v. Nordyne*, LLC, No. 14-CIV-21884-Bloom/Valle, 2014 U.S. Dist. LEXIS 189248, at *17 (S.D. Fla. Nov. 13, 2014) ("Reliance is not required for causation under FDUTPA"). "When addressing a deceptive or unfair trade practice claim, the issue is not whether the plaintiff actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances." *Harris*, 2014 U.S. Dist. LEXIS 189248, at *19.

Uber argues that "[b]ecause Plaintiff has demonstrably failed to plead causation, his FDUTPA claim should also be dismissed." Motion at 10. This argument holds no merit. Indeed, as the foregoing case law spells out, to plead causation under FDUTPA, all that is required is a showing that there is a causal connection between the alleged deceptive act and the alleged damages. *See* § 501.211(2), Fla. Stat. ("[A] person who has suffered a loss *as a result* of a violation of this part . . . ." (emphasis added)).

The Complaint alleges that Uber failed "to properly conduct background checks and identity verifications of Uber drivers, and/or take appropriate actions to protect the public from misrepresentations of prospective or existing Uber drivers that reasonably could have been discovered by a proper background check and identity verification, and issuing complete and accurate 1099 forms, resulting in foreseeable harm to the public." Complaint at ¶ 117. Mr. Josefsberg also alleged a causal connection between the deceptive act and the alleged damages, stating that "due to Uber's failure to

abide by its own background check and identity verification policies and procedures and failure to issue complete and accurate 1099 forms, Uber allowed an individual to assume Mr. Josefsberg's identity in driving for Uber." *Id*. at ¶ 119.  Finally, Mr. Josefsberg alleged:

> [a]s a direct and proximate result of Uber's unfair, unlawful and/or deceptive business practices described herein, Mr. Josefsberg has been aggrieved and suffered an injury in fact because Uber has obtained valuable property, money and/or services at the expense of Mr. Josefsberg, including but not limited to incurring costs associated with (i) hiring and paying professionals to rectify the incorrect tax filings, (ii) adverse effects on his tax filing status, (iii) filing and pursuing a complaint for identity theft with the FTC, and (iv) other adverse effects of identity theft.

*Id*. at ¶ 121.  Thus, Mr. Josefsberg has sufficiently pled causation for the purposes of his FDUTPA claim against Uber.

## B.  Mr. Josefsberg Has Properly Alleged His FDUTPA Claim as an Aggrieved Party.

Mr. Josefsberg acknowledges that his monetary damages are consequential and cannot be recovered under FDUTPA.  However, this does not bar his claim against Uber.

"In the context of FDUTPA, 'actual damages' are defined as the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. 3d DCA 2010).  "This is the FDUTPA's sole permissible measure of recovery—the statute expressly excludes claims for personal injury or consequential damages to any 'property other than the property that is the subject of the consumer transaction.'"  *In re Am. Med. Collection Ag. Customer Data Sec. Breach Litig.,* No. 19-MD-2904, 2021 U.S. Dist. LEXIS 240360, at *91 (D.N.J. Dec. 16, 2021).

Nevertheless, even if Mr. Josefsberg has not yet suffered "actual damages" in the context of FDUTPA, the claim still stands because Mr. Josefsberg is an *aggrieved party*.  *See Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1191 (M.D. Fla. 2022).  "[I]n the absence of actual damages, the FDUTPA permits any 'aggrieved party' to pursue injunctive relief."  *Id.*  "Put plainly, a plaintiff is 'aggrieved'

under FDUTPA when the deceptive conduct alleged has caused a non-speculative injury that has affected the plaintiff beyond a general interest in curbing deceptive or unfair conduct." *Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 616CV2001ORL31GJK, 2017 U.S. Dist. LEXIS 101675, at *17 (M.D. Fla. June 30, 2017).

In *Farmer*, which Uber relies upon in its Motion, the court held that the plaintiff's alleged injuries were "sufficient to support a claim for injunctive relief under FDUTPA" despite plaintiff's failure to show actual injury stemming from the defendant's conduct. 582 F. Supp. 3d at 1192. There, the plaintiff was the victim of a data breach and "identifie[d] a series of non-speculative injuries he suffered from the data breach, including (i) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of [his] PII and PHI, (ii) time spent dealing with the consequences of the data breach, and (iii) a substantially increased risk of fraud and identity theft." *Id*. at 1191-92.

Like the plaintiff's injuries in *Farmer*, the instant Complaint alleges that Mr. Josefsberg has suffered non-speculative injuries such as the costs associated with "(i) hiring and paying professionals to rectify the incorrect tax filings, (ii) adverse effects on his tax filing status, (iii) filing and pursuing a complaint for identity theft with the FTC, and (iv) other adverse effects of identity theft." Complaint at ¶ 121. Additionally, Mr. Josefsberg explicitly seeks "injunctive relief  preventing Uber from engaging in any of the above-described unfair, unlawful and/or business practices in the future." *Id*. at ¶ 123. Further, the Complaint requests that the Court enter judgment in favor of Mr. Josefsberg, seeking, among other items, "injunctive relief requiring Defendants to provide Mr. Josefsberg and all Class members continuous credit monitoring services, periodic credit reporting, and credit repair services, and requiring Uber to file with the IRS and all applicable tax authorities corrected tax forms as to Mr. Josefsberg and all Class members." *Id*. at p. 29, ¶ D. Considering the foregoing, Mr. Josefsberg has adequately alleged damages under FDUTPA, and his claim should not be dismissed.

**C.  Heightened Pleading Standards of Federal Rule of Civil Procedure 9(b).**

*i.  Rule 9(b) Does Not Apply to Mr. Josefsberg's FDUTPA Claim.*

Uber argues that "several" courts within this District have required Rule 9(b)'s heightened pleading standard for FDUTPA claims.  *See* Motion at 21.  Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  However, Uber fails to acknowledge that many district courts in the Eleventh Circuit, including this District, also hold that the heightened pleading requirements of Rule 9(b) do not apply to claims brought under FDUTPA.  *See*, *e.g.*, *Harris*, 2014 U.S. Dist. LEXIS 189248, at *13 ("Rule 9(b) does not apply to FDUTPA claims"); *Toback v. GNC Holdings, Inc.*, No. 13-80526-CIV, 2013 U.S. Dist. LEXIS 131135, at *4 (S.D. Fla. Sep. 13, 2013) (same); *U.S. Bank Nat'l Ass'n v. Capparelli*, No. 13-80323-CIV, 2014 U.S. Dist. LEXIS 84284, at *17 (S.D. Fla. June 19, 2014) ("Rule 9(b) does not apply to FDUTPA claims, [and] its requirements cannot serve as a basis to dismiss those claims."); and *Costa v. Kerzner Int'l Resorts, Inc.*, No. 11-60663-CV-COHN, 2011 U.S. Dist. LEXIS 66921, at *7 (S.D. Fla. June 23, 2011) (concluding that "a FDUTPA plaintiff need not meet the Rule 9(b) pleading standard for fraud claims").

The line of cases cited by Uber to support its contention that Rule 9(b)'s heightened pleading standard applies to FDUTPA claims each involved claims based in fraud.  *See Dhtk, Ltd. Liab. Co. v. Unknwn, Ltd. Liab. Co.*, No. 1:19-cv-61627-GAYLES, 2020 U.S. Dist. LEXIS 154591, at *9 (S.D. Fla. July 22, 2020) ("The Court also finds that because Counts VII (conversion), VIII (civil theft), and IX (FDUPTA) sound in fraud, plaintiff is required to comply with Rule 9(b)"); *Llado-Carreno v. Guidant Corp.*, No. 09-20971-CIV, 2011 U.S. Dist. LEXIS 17088, at *14-15 (S.D. Fla. Feb. 22, 2011) ("The particularity  requirement of Rule 9(b) applies to all claims that sound in fraud, regardless of whether those claims are grounded in state or federal law").  Here, Mr. Josefsberg's FDUTPA claim

does not sound in fraud. Nowhere in the Complaint does Mr. Josefsberg allege that he was induced by or suffered damages in reliance on Uber's misrepresentations at issue – essential elements of any common law fraud allegation. *Cf. Dhtk*, 2020 U.S. Dist. LEXIS 154591, at \*9-10 (finding plaintiff's FDUTPA claim was sound in fraud, as the complaint alleged "[plaintiff] *reasonably relied upon the misrepresentations* of the Defendants ….") (emphasis added); *Llado-Carreno*, 2011 U.S. Dist. LEXIS 17088, at \*14 (finding plaintiff's FDUTPA claim appeared to allege fraud, which stated that the defendant "deceptively and unlawfully induc[ed plaintiff] to purchase and/or have [product] implanted in his body"). And, as discussed *supra*, FDUTPA does not require a plaintiff to contend he "actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances." *Harris*, 2014 U.S. Dist. LEXIS 189248, at \*19.

Because Mr. Josefsberg's FDUTPA claim does not sound in fraud, Rule 9(b)'s heightened pleading standard is not applicable and thus cannot serve as a basis to dismiss Count IV.

### ii. Nonetheless, Mr. Josefsberg's FDUTPA claim meets Rule 9(b)'s heightened pleading standards.

Even if the Court determines Rule 9(b) applies to Mr. Josefsberg's FDUTPA claim, the Complaint's allegations supporting that claim meet the Rule's heightened pleading standards. Rule 9(b) provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," but that "[m]alice, intent, knowledge, and other conditions of a person's mind shall be averred generally." Fed. R. Civ. P. 9(b). "Generally speaking, a pleading that sounds in fraud is sufficiently presented when the complaint establishes the 'who, what, when, where, and how of the fraud.'" *N.A.S. v. Morada-Haute Furniture Boutique LLC*, No. 20-24676-Civ-GAYLES/TORRES, 2022 U.S. Dist. LEXIS 183872, at \*25 (S.D. Fla. July 22, 2022) (citing *Ceithaml v. Celebrity Cruises, Inc*., 207 F. Supp. 3d 1345, 1353 (S.D. Fla. 2016)); *see also Dhtk*, 2020 U.S. Dist. LEXIS 154591, at \*10 ("Mr. Josefsberg must identify '(1) the precise statements,

documents or misrepresentations made; (2) the time and place of and persons responsible for the statement; (3) the content and manner in which the statements misled the [P]laintiff; and (4) what the Defendants gain[ed] by the alleged fraud.'").

Mr. Josefsberg's Complaint plausibly articulates: ***the who*** ("Uber," Complaint at ¶¶ 46, 118); ***the what*** (Uber's "false representations that it follows the background check and identity verification policies and procedures warrantied on its *Driver Screening* webpage," *id.* at ¶ 118); ***the when*** (from at least "June 19, 2022" to "September 26, 2022," *id.* at ¶¶ 29, 44); and ***the where and the how*** ("Uber's website contains an extensive page dedicated to 'Driver Screening.' *See* https://www.uber.com/us/en/ride/safety/driver-screening/," *id.* at ¶ 25; "on [Uber's] *Driver Screening* webpage," *id.* at ¶¶ 46, 118). *See N.A.S*, 2022 U.S. Dist. LEXIS 183872, at \*25.

The Complaint also meets the requirements set forth in *Dhtk*: (1) the precise statements, documents or misrepresentations made include Uber's "false representations that it follows the background check and identity verification policies and procedures warrantied on its *Driver Screening* webpage" (*see* Complaint at ¶ 118); (2) the time the false representations occurred were from at least "June 19, 2022" to "September 26, 2022" (*id.* at ¶¶ 29, 44), the place the false representations occurred were on "Uber's website [that] contains an extensive page dedicated to 'Driver Screening' (*id.* at ¶ 25), and the party responsible for such false representations is "Uber" (*id.* at ¶¶ 46, 118); (3) the content and manner in which the statements misled Mr. Josefsberg (and all other consumers acting reasonably) include Uber "failing to comply with the background check and identity verification procedures and policies listed on its *Driver Screening* webpage, as it claims to not have any documents or correspondence related to any background check or identity verification for the fraudulent account" (*id.* at ¶ 46), "despite its false representations that it follows" such policies and procedures (*id.* at ¶ 118); and (4) "Uber allowed an individual to assume Mr. Josefsberg's identity in driving for Uber" (*id.* at ¶ 119) and through the alleged fraud, "Uber has obtained valuable property, money and/or services

at the expense of Mr. Josefsberg" (*id.* at ¶ 122), including but not limited to Uber's savings on the costs it would have incurred in properly screening and vetting its drivers and the profits derived from the driver who assumed Mr. Josefsberg's identity.  *See Dhtk*, 2020 U.S. Dist. LEXIS 154591, at *10.

The cases Defendant relies on were dismissed because of their wholly deficient complaints, the deficiencies of which are not present in Mr. Josefsberg's Complaint.  *See id.* at *10-11 (dismissing plaintiff's conversion, civil theft, and FDUTPA claims under Rule 9(b) because the complaint "nowhere stated any precise misrepresentations" and made "no distinction between the Corporate Defendants and the Individual Defendants, merely lumping them together in each count and failing to distinguish their conduct"); *Llado-Carreno*, 2011 U.S. Dist. LEXIS 17088, at *15 (dismissing plaintiff's FDUTPA claim because plaintiff's "general allegation that '[defendant's] actions are deceptive and in clear violation of FDUTPA' (Compl. ¶ 52) is not supported by any specific facts, and as a consequence, [plaintiff] does not satisfy the heightened pleading requirement required by Federal Rule of Civil Procedure 9(b)").  As demonstrated above, Mr. Josefsberg's FDUTPA claim is supported by detailed and specific facts regarding Uber's misrepresentations.  *See* Complaint at ¶¶ 25, 29, 46, 117-19.  As such, Mr. Josefsberg has satisfied the heightened pleading requirements under Rule 9(b), even if they are inapplicable here, and Mr. Josefsberg's FDUTPA claim should not be dismissed.

**D.  Count IV of the Complaint is Not Barred by FDUTPA's Safe-Harbor Provision.**

Uber argues that the Court should dismiss Count IV of the Complaint because "the safe-harbor provision of FDUTPA insulates Uber against Mr. Josefsberg's FDUTPA claim" because it "prevent[s] claims against defendants who have taken actions endorsed by federal or other state law."  Motion at 22, 23 (citing FDUTPA's section 501.212(1)).  FDUTPA's so-called "safe harbor" provision states that FDUTPA does not apply to "[a]n act or practice required or specifically permitted by federal or state law."  § 501.212(1), Fla. Stat.; *Kuenzig v. Hormel Foods Corp.*, 505 F. App'x 937, 939 (11th Cir. 2013).  "The purpose of the safe harbor provision is obvious: it would be unacceptably inconsistent for

one statute to penalize conduct mandated elsewhere." *Young v. Cmty. Health Sys., Inc.*, No. 8:22-cv-329-SCB-AEP, 2022 U.S. Dist. LEXIS 237079, at *15 (M.D. Fla. Sep. 16, 2022).

In furtherance of its argument, Uber asserts that it is a "transportation network compan[y]" ("TNC"), and any failure to conduct background checks or review applicants' driving histories is barred under the purview of Florida Statutes § 627.748. *See id.* at 22-23. While section 627.748 may preempt a plaintiff's FDUTPA claim in limited circumstances, Uber's conduct at issue is not "endorsed" by federal or state law, nor is section 627.748 the exclusive law governing TNCs. Thus, FDUTPA's safe-harbor provision does not bar Mr. Josefsberg's claim against Uber.

Uber states that TNCs, such as Uber, may "only accept driver applications from individuals who provide certain information (such as an address, driver license, and vehicle registration) and to conduct background checks and review applicants' driving histories." Motion at 23 (citing Fla. Stat. § 627.748(12)(a)). However, it is clear that Uber ***did not*** comply with the background check requirements of TNCs under section 627.748(12)(a). *See* Complaint at ¶¶ 42, 46, 117-18. Among other conditions, this section provides that TNCs must obtain certain information from prospective drivers before allowing them to accept a ride, including information regarding their driver licenses and motor vehicle registrations. § 627.748(12)(a), Fla. Stat. In addition, the statute specifically requires that TNCs maintain "[i]ndividual records of TNC drivers for at least 1 year after the date on which the TNC driver's relationship with the TNC ends." § 627.748(15)(b), Fla. Stat.

Here, the Complaint alleges that Uber admitted it did not possess any documents related to the background check or identity verification it purportedly conducted on the person who applied to be a driver under Mr. Josefsberg's name. *See* Complaint at ¶¶ 42, 46. Under section 627.748(12)(a), such documentation should have included information reflecting the driver license and motor vehicle registration reviewed by Uber when approving the identity thief's account. Further, Uber admitted that it does not possess any of the documents related to the applicant's background check or identity

verification, as required under section 627.748(15)(b).  *See id.* at ¶ 42.  By failing to collect and retain the applicant's driver license or motor vehicle registration information, Uber's conduct does not amount to "[a]n act or practice required or specifically permitted by federal or state law."  *See* Fla. Stat. § 501.212(1).  Rather, Uber's conduct is a direct violation of section 627.748(12)(a).  FDUTPA's safe-harbor provision does not save Uber here.

The cases cited by Uber to support its argument are inapposite.  The *Young* and *Eirman* plaintiffs both alleged that defendants complied with federal law yet attempted to impose on defendants legal obligations greater than those required by federal law.  *See Young,* 2022 U.S. Dist. LEXIS 237079, at *15 (plaintiff "essentially asserts that the disclosure required by federal law does not require enough of Defendants and that Defendants are in violation of FDUTPA for failing to do more than is required by federal law"); *Eirman v. Olde Disc. Corp.*, 697 So. 2d 865, 866 (Fla. 4th DCA 1997) ("Receipt of order flow payments was permitted by federal law during the time period at issue").[5]  That is not the case here.  Mr. Josefsberg's FDUTPA claim is rooted in the fact that Uber conducted itself in a manner that is in direct violation of section 627.748.  In addition, neither *Young* nor *Eirman* involved FDUTPA claims for conduct that was allegedly permitted by Chapter 627, or any other Florida law for that matter, as is the case here.

As Uber acknowledged, "[s]ection 627.748 did ***not*** impose a requirement that Uber independently verify the ***identity*** of the applicant in order to weed out persons who are assuming the identity of another person."  Motion at 23.  Mr. Josefsberg's FDUPTA claim falls outside the scope of any safe harbor provisions because Mr. Josefsberg is not arguing that Uber needed to verify Mr. Josefsberg's identity for driving purposes but for the purpose of running a background check.  Thus,

---

[5] The *Eirman* Court also focused on the issue of whether federal law (the Securities Exchange Act of 1934) preempted state law by implication.  The portion of the *Eirman* decision relating to dismissing the plaintiff's FDUTPA claim, upon which Uber relies, is a mere three sentences, cites no caselaw, and provides little to no instructive analysis.

allowing Mr. Josefsberg's FDUTPA claim to stand would not subject Uber to penalties mandated under Section 627.748.  *Cf. Young*, 2022 U.S. Dist. LEXIS 237079, at *17-18.

Further, even though "[s]ection 627.748 did ***not*** impose a requirement that Uber independently verify the ***identity*** of the applicant in order to weed out persons who are assuming the identity of another person," Uber has voluntarily taken on that task.  *See* Motion at 23.  As alleged in the Complaint, Uber claims to follow the identity verification policies and procedures warrantied on its *Driver Screening* webpage. *See* Complaint at ¶ 118.  Further, as alleged in the Complaint and discussed *supra*, Uber's background check and identity verification policies and procedures warrant the following:

> **Assuming someone else's identity is prohibited.** Drivers are periodically asked to take a photograph of themselves, which we match against their on-file identification to help make sure the right driver is behind the wheel.

*Id*. at ¶ 25(d).  Despite making this representation, Uber did not verify the identity of the person who used Mr. Josefsberg's identity to become an Uber driver.  Instead, Uber approved that person's application to become a driver, permitted him to drive for Uber under Mr. Josefsberg's name and social security number, and allowed him to continue to do so, unabridged, until well after Mr. Josefsberg, on August 15, 2022, notified Uber of the fraudulent account and demanded that Uber cancel all Uber driver accounts using his name.  *See id*. at ¶ 33.  In fact, it took another approximately ***six weeks***, until September 26, 2022, for Uber to deactivate that account and confirm to Mr. Josefsberg that it had done so.  *See id.* at ¶ 44.  Thus, the safe harbor analysis requires more than a determination of whether Uber abided by the requirements of TNCs under section 627.748(12)(a); it requires consideration of Uber's misleading representations that it requires photograph verification of its drivers, among other things, upon which Mr. Josefsberg's FDUTPA claim is based, which do not fall under the safe-harbor

provision of FDUTPA's section 501.212(1).  As such, Mr. Josefsberg's FDUTPA claim should not be dismissed.

<b><u>CONCLUSION</u></b>

WHEREFORE, Plaintiff, Damian R. Josefsberg, individually and on behalf of all others similarly situated, respectfully requests that this Court deny in its entirety Defendant Uber Technologies, Inc.'s Motion to Dismiss Plaintiff's Class Action Complaint and grant any other relief the Court deems just and proper.[6]

Respectfully submitted this 17th day of March, 2023.

DAMIAN | VALORI | CULMO
*Counsel for Damian Josefsberg*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone:  (305) 371-3960
Facsimile:  (305) 371-3965

/s/ *Kenneth Dante Murena*
Kenneth Dante Murena, Esq.
Florida Bar No. 147486
E-mail: kmurena@dvllp.com

<b><u>CERTIFICATE OF SERVICE</u></b>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via this Court's CM/ECF filing system on this 17th day of March, 2023, on all counsel or parties who have appeared in the above-styled action.

/s/ *Kenneth Dante Murena*
Kenneth Dante Murena, Esq.
Florida Bar No. 147486

---

[6] In the event the Court is inclined to grant Checkr's Motion as to any Count, Mr. Josefsberg would respectively request leave to amend such Count(s) to address any deficiencies the Court may identify.